Filed 4/6/23  P. v. Souter CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>PAUL JOSEPH SOUTER,<br><br>        Defendant and Appellant. | A161941<br><br>(San Mateo County<br>Super. Ct. No. 16SF009515A) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SHELBY LYNNE LUJAN,<br><br>        Defendant and Appellant. | A162047<br><br>(San Mateo County<br>Super. Ct. No. 16SF009515B) |

In these consolidated appeals, Shelby Lynne Lujan and Paul Joseph Souter appeal after a jury convicted them each of criminally negligent animal cruelty (Pen. Code, § 597, subd. (b)) involving the death of Lujan's dog.[1]  The trial court suspended imposition of sentence, placed both Lujan and Souter on two years' probation, and ordered them to serve (respectively) 90 days and eight months in county jail.

---

[1] Undesignated statutory references are to the Penal Code.

1

Lujan and Souter raise numerous arguments, including insufficiency of the evidence; clerical error; evidentiary challenges (and related claims of ineffective assistance of counsel); and that recent changes in the law require us to vacate certain imposed fees. We agree only in part and modify the orders of probation to strike the probation supervision and jurisdiction transfer fees. In all other respects, we affirm.[2]

## BACKGROUND

### A.

Section 597, subdivision (b), provides (in relevant part): "[W]hoever, having the charge or custody of any animal, either as owner or otherwise, subjects any animal to needless suffering, or inflicts unnecessary cruelty upon the animal, or in any manner abuses any animal, . . . is, for each offense, guilty of a crime." In other words, "criminal liability under section 597(b) may be imposed on a person who has custody of, or is responsible for providing care to, an animal and commits an act or omission proscribed by that subdivision that recklessly exposes the animal to a high risk of death" or great bodily injury. (*People v. Riazati* (2011) 195 Cal.App.4th 514, 531 (*Riazati*), italics omitted.)

### B.

In 2015, Lujan adopted a small breed puppy named Sprocket. Sprocket primarily lived with Lujan in a room she rented in San Bruno.

In January 2016, Lujan and Sprocket traveled to New Mexico, where Lujan was raised. While there, Lujan began

---

[2] Souter also filed a petition for writ of habeas corpus (*In re Souter* (Sept. 16, 2022, A166115)), which raises the same ineffective assistance of counsel arguments that he raises on appeal. We deferred the question of whether to issue an order to show cause pending this appeal. By separate order, we deny the habeas petition.

dating Souter and, in April 2016, Souter and his dog (Athena) joined Lujan and Sprocket in her room in San Bruno.

On April 19, Souter was caring for Sprocket while Lujan was at school, when Souter texted Lujan, " 'Your dog got burned with hot water cause I was trying to make tea and tripped over Athena and spilt the hot water on the floor where your dog was laying.' " Lujan responded, " 'My poor baby!' " and asked if Sprocket was in pain. Souter texted back: " 'I feel bad for him. [¶] . . . [¶] . . . I'm sorry babe. He will walk but he is just laying down but yeah he looks like it hurts.' " Souter also sent Lujan a photograph that showed Sprocket's bright pink underside.

Heather P., who worked as a veterinary technician for a local veterinary hospital, remembered speaking to a man on the phone (in April 2016) who said he "accidentally spilled hot water on his dog" and wanted to know if he could treat the burns at home. She told the man that most burns are easily infected, said that he should have the dog examined by a veterinarian, and provided him with information for an emergency veterinary clinic. The man repeatedly asked if he could treat the dog's wounds with burn cream, but Heather told him that doing so was not recommended and that he should take the dog to a veterinarian.

## C.

Two days later, on April 21, Lujan and Souter exchanged text messages wherein Souter admitted he was still feeding and disciplining Sprocket. Souter returned to New Mexico three days later, on April 24.

The next day, Lujan texted him two photos of Sprocket, which showed extensive blistering and pus on Sprocket's underside. They also exchanged the following text messages:

"Souter: [Were] they like that before the bath it might be skin coming off from healing.

3

"Lujan: Well he was laying down and when I checked on him he was like all wet there as if he was sweating. So I took him potty and then wanted to wash him off . . . [¶] . . . [¶]

"Lujan: Some of them looked like they opened up so they are not full of liquid . . . it's like open skin so I wanted to be sure they were clean.

"Souter: Well pop one and see I guess.

"Souter: Oh it might just be the healing. What [does] the skin under it look.

"Lujan: Just like a raw open wound."

Lujan next texted Souter a photo that showed a tissue with puss on it. They then texted the following:

"Lujan: That's what color it is though . . . it doesn't smell and there is nothing puffy or red around the skin.

"Souter: Well then it [is probably] just the healing process most likely just realized moved the skin from the ones that are open and keep it clean.

"Lujan: Okay thanks my love.

"Lujan: Should I put peroxide on it or just the spray we bought.

"Souter: Put peroxide and if he curled with you or was you sweet on him so you need to leave him in the cage." Lujan agreed and told Souter that Sprocket had fallen off the bed in the middle of the night.

The next day (April 26), Souter asked how Sprocket was doing. Lujan replied, " 'Well he won't do simple things like trying to jump out of the tub or seats in the car. And he won't lift his leg to pee at all. He tried today but it was his left leg and he fell over. . . . [¶] . . . And he has stopped going into his crate. He couldn't lift his leg up so we went and laid in Athena's crate.' "

4

Souter said, " 'It might be how the burns also it is going to be a little tight for him he won't be able to move fully [until] it is healed and he is able to stretch the tissue out cause all he has been doing is laying down. And not working any muscles or eating so he is getting weak.' " Lujan responded, " 'I gave him the other can of wet food that I had and he ate about half of it. But he is pretty much refusing hard foods.' " Lujan said, " 'I may have to take him in' " but also attributed Sprocket's lack of appetite to a bad tooth. However, Souter said, " 'It might be hard for him to eat you can feel how much weight he [lost he] is [probably] [wea]k.' "

Later in the conversation, Souter instructs Lujan to " 'feed him regular amounts of food and start to mix hard food with the wet food and he will gain his weight back.' " He also noted that " '[Sprocket] doesn't move around so he is losing muscle mass [because] his body is focused on healing . . . right now.' " Lujan admits, " 'Okay, I'm just super worried about him. I just don't want him to be ill from something else thinking it's just him healing from the burn.' " Souter responds, " 'Well you do what you want but I am just saying after feeling him he is just skinny and weak.' "

On April 27, Lujan noted that " 'all Sprocket does is lay around,' " that she had seen him with his tail out from between his legs " 'for the first time in forever,' " and that his " 'blisters are like self [popping] and then [scabbing] over but before they scab he is all sticky.' " Lujan also sent Souter another photo of Sprocket's abdomen, which was now black. Lujan said, " 'It looks much better dried out,' " and Souter replied that " 'he looks like he [is] healing nicely.' "

On April 29, Lujan texted Souter to tell him that Sprocket was " 'healing really well' " but also sent him a photo that showed the dog sleeping in an awkward position that avoided contact between his burns and the dog bed.

On April 30, Lujan texted Souter to tell him that Sprocket had an accident indoors and " 'had blood in his poop.' " Souter suggested that she watch him at home and wait to see if there was more blood the next day. When Lujan said she was " 'freaking out' " and going to call her vet in the morning, Souter added, "Well you can call an emergency vet if you want answers now but all vet[s] do is tell you to bring them in."

Later that same night, Lujan told Souter that she was purchasing medical scissors and peroxide and that she planned to cut Sprocket's " 'dead' " skin off. She also commented that " 'the puss from the blisters stinks so bad' " and sent photographs that showed open wounds on Sprocket's hind legs. After they discussed cutting off Sprocket's skin, she sent a photo of Sprocket's hind legs with the skin removed—which showed raw exposed wounds. She acknowledged removing the skin was painful for Sprocket and said, "That is so hard to do on my own!!!"

On May 1, Lujan told Souter that Sprocket could not stand up, his feces were " 'black and runny,' " that Sprocket had not eaten on his own in two days, and that he was like a " 'limp noodle.' " When she texted Souter to tell him that she was taking Sprocket to the emergency vet, Souter asked if she was mad at him. Lujan replied, " 'No I'm not mad at you I'm more mad at myself. If I had just brought him in maybe it would not be so bad.' "

### D.

The treating veterinarian (Dr. Eric Barchas) testified that Sprocket was in "very, very poor condition" and "extremely emaciated"—having lost roughly one-third of his body weight—when he arrived at the clinic. At this point, there was no chance that Sprocket would survive.

Dr. Barchas described Sprocket as having suffered third degree burns to large (and symmetrical) portions of the underside

6

of his body, including his footpads, legs, genitals, belly, and his chest.  Sprocket could not maintain a normal body temperature, was dehydrated, and was in both hypovolemic shock and septic shock.  He was not fully conscious and did not have the strength to stand or to roll over.  Much of Sprocket's skin was black, which indicated it was dead and would not heal.  Sprocket emitted a "very strong odor of infection."  He was also shedding his intestinal lining, which contributed to the foul smell.

Dr. Barchas first administered pain medication because Sprocket was in obvious "agonizing pain", as evidenced by his continuous whimpering and flinching when the burned areas were touched.  Dr. Barchas discussed Sprocket's grave prognosis and suffering with Lujan.  He also recommended euthanasia, which she declined.

Dr. Barchas attempted to treat Sprocket with intravenous pain medication and antibiotics.  But Sprocket died—when his heart stopped—about five hours after arriving at the clinic.  Dr. Barchas, who is a mandatory reporter, reported his suspicion that Sprocket did not receive appropriate care to the Peninsula Humane Society.

Three weeks after Sprocket's death, an investigator with the Peninsula Humane Society (Christina Hanley) interviewed Lujan.  Lujan insisted that both she and Souter were there when Sprocket was accidentally burned and that they followed a veterinarian's suggestion that Sprocket could be treated at home—by keeping his burns clean and dry with gauze and burn cream.

Specifically, Lujan told Hanley that Souter had called two or three veterinarians in the San Bruno area for advice and that some of the receptionists he spoke to had advised him to bring Sprocket in "immediately" while others said Sprocket could be treated at home.  Lujan admitted that Sprocket started losing "a lot of weight" almost immediately after he was burned.

Hanley also briefly interviewed Souter (twice), but neither interview was recorded. Souter's account was the same as Lujan's, except that he stated not a single veterinarian advised him to bring Sprocket in for examination. Souter could not provide names for any of the veterinarians or hospitals he called.

Lujan was reinterviewed and confronted with the fact that every veterinarian's office that investigators spoke to said that they would never tell someone to treat a burned dog at home. In fact, the receptionists Hanley spoke to explained that they were forbidden from giving medical advice over the phone. Lujan continued to maintain that she was present when Sprocket was burned. She also denied smelling any odor on Sprocket after the burns.

### E.

Veterinarian Dr. Melinda Merck testified, as an expert witness on veterinary medicine and forensic science, that third degree burns are always serious injuries (and sometimes fatal) for dogs. An owner should bring a burned animal to the vet as soon as possible because burns cause immense pain and require the administration of pain medication, antibiotics, antianxiety medication, and sometimes anesthesia. An animal is at greatest risk for developing severe complications, such as septic shock, five to seven days after a serious burn.

Dr. Merck testified that the home treatment Lujan and Souter provided—removing Sprocket's dead skin, touching his burns, bathing him, and applying antiseptic—would have been very painful and contributed to Sprocket's shock, infection, and fluid loss.

### F.

Souter's phone records showed that he made three phone calls to veterinary hospitals on April 19. The calls lasted approximately two, three, and five minutes, respectively.

By the time of trial, Lujan and Souter were no longer dating. Lujan testified that, on April 19, Souter was caring for Sprocket while she was at school. After learning of the burns, she spoke to Souter over the phone and decided he would call veterinarians for advice. She admitted lying to Hanley (on three separate occasions) about being present at the time Sprocket was burned. She lied because she thought no one would otherwise believe that Souter accidentally burned Sprocket.

Lujan and Souter bought first aid supplies to treat Sprocket at home. They did so because she understood that only one veterinarian advised Souter to bring Sprocket into the hospital; all the others advised treating him at home. She believed Souter because, having been around farm animals her whole life in New Mexico, she was accustomed to calling a veterinarian and then following instructions at home.

Lujan did not take Sprocket to the vet sooner because she did not know he was in pain and thought he was healing. Although she knew that burns could lead to infection, she was not concerned about Sprocket's blackened skin, his popping blisters, or his raw, open wounds and did not believe Sprocket was in pain. Lujan testified that Sprocket did not begin whimpering until she brought him to the vet on May 1. She attributed the fact that Sprocket stopped eating dry food to a bad tooth. Alternatively, she thought it meant that he was healing. However, she admitting knowing Sprocket was in pain when he could not lift his leg to urinate.

Two character witnesses testified that Lujan was good with animals. One of the veterinarians, who evaluated Sprocket on the day he died (but after his wounds had been dressed and cleaned), testified that he did not remember a particularly strong odor. He described Lujan as distraught, worried, and panicked.

9

**G.**

A jury convicted both Lujan and Souter on one count each of criminally negligent animal cruelty (§ 597, subd. (b); count two). The jury was unable to reach a verdict on count one—for purposeful and malicious animal cruelty (§ 597, subd. (a))—which was charged only against Souter.

At sentencing, the court denied defense motions to reduce both felony convictions to misdemeanors (§ 17). The court suspended imposition of sentence and placed both Lujan and Souter on two years' felony probation, on the condition that they serve 90 days and eight months (respectively) in county jail. Among other fines and fees, the trial court imposed a probation supervision fee (of up to $100 per month) and a jurisdictional transfer fee ($600).

## DISCUSSION

**A.**

Lujan argues that insufficient evidence supports her conviction because there is no substantial evidence that she caused great bodily injury or death to Sprocket. We disagree.

**1.**

When faced with a substantial evidence challenge, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord, *Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.) We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate witness credibility. (*People v. Jones* (1990) 51 Cal.3d 294, 314.) The same standard of review applies to cases in which the People rely mainly on

circumstantial evidence. (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

## 2.

Lujan insists that she cannot be convicted of violating section 597, subdivision (b), because she did not cause Sprocket's great bodily injury or death. In support of her argument, Lujan notes that it is undisputed *Souter* inflicted Sprocket's third degree burns and asserts that Sprocket's death was thereafter inevitable. In her view, nothing she did (or failed to do) had any effect.

Lujan misconceives the relevant inquiry. The question is not whether she caused Sprocket's burns or his death. The animal cruelty statute, like the child endangerment statute (§ 273a), does not require *any* actual harm or injury be caused by the defendant's acts or omissions. (See *People v. Valdez* (2002) 27 Cal.4th 778, 784; *Riazati, supra,* 195 Cal.App.4th at p. 531.) Instead, in a needless suffering case (like this one), the relevant inquiry is whether the defendant's acts or omissions *recklessly exposed the animal to a high risk of death or great bodily injury.* (§ 597, subd. (b); *Riazati,* at p. 531; *People v. Brunette* (2011) 194 Cal.App.4th 268, 284.)

## 3.

Here, substantial evidence supports the jury's implicit finding that Lujan's grossly negligent acts or omissions created a high risk of Sprocket's death or great bodily injury. Sprocket died from septic shock caused by an untreated infection from his burns. And a jury could reasonably infer from the prosecution's evidence that Lujan's acts and omissions contributed to his death.

First, it is undisputed that Lujan deprived Sprocket of veterinary care for almost two weeks after he was burned. And although Dr. Merck testified that severe burns can be life

11

threatening, Dr. Merck did not testify that, based on her review of the medical records, photographs, and text messages, Sprocket's case was hopeless from the time of his initial burns, that he would have necessarily been euthanized if initially brought in for veterinary care sooner, or that Souter's act or omissions alone created a high risk of great bodily injury or death.[3] Rather, Dr. Merck testified about numerous treatment options—such as surgical debridement, pain and antianxiety medication, intravenous and topical antibiotics, and intravenous fluids—that would have been offered to a dog who came in for medical attention shortly after being burned.

Dr. Merck also testified that, while euthanasia may be initially considered in severe burn cases, survival depends on burn severity, how much of the body is affected, and the animal's general health before the burns were suffered. In contrast, Dr. Barchas testified Sprocket had no chance of survival when he was brought in (on May 1).

Second, Dr. Merck also testified that Lujan's admitted acts of "home treatment"—including removing Sprocket's dead skin, touching his burns, bathing him, and applying antiseptic—would have all been very painful for Sprocket and contributed to his risk of shock, dehydration, and infection (all of which can be fatal). Lujan may not have caused the burns, but the jury could

---

[3] Nor does the evidence conclusively establish that, had Lujan brought Sprocket to the vet earlier, she would have (as she now asserts) simply euthanized Sprocket because treating him would have been too expensive given his likely prognosis at the time. In 2016, Lujan was both a full-time student and working part-time. Her monthly income fluctuated between $800 and $1,200. However, Lujan testified that she borrowed $2,000 from her mother—to begin treatment on May 1—despite Sprocket's grave prognosis and Dr. Barchas's recommendation that Sprocket be euthanized.

12

reasonably infer that her acts and omissions made his injuries worse and increased the risk he would die.

Substantial evidence supports the jury's implicit finding that Lujan's acts or omissions exposed Sprocket to a high risk of death or great bodily injury.

**B.**

Souter contends that his trial counsel provided ineffective assistance by stipulating to an element of the offense—that Sprocket was in Souter's care between April 19 and April 24. (See § 597, subd. (b) ["whoever, *having the charge or custody of any animal, either as owner or otherwise*, subjects any animal to needless suffering, or inflicts unnecessary cruelty upon the animal, or in any manner abuses any animal, . . . is, for each offense, guilty of a crime"], italics added.) We disagree.

**1.**

Under both the United States and California Constitutions, a criminal defendant has the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 684-686 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 215 (*Ledesma*).) To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance was so deficient that it fell below an objective standard of reasonableness, under prevailing professional norms, and (2) the deficient performance was prejudicial, rendering the results of the trial unreliable or fundamentally unfair. (*Strickland, supra*, at pp. 688, 692; *Ledesma, supra*, at pp. 216-217.)

"[W]e begin with the presumption that counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' " (*People v. Mickel* (2016) 2 Cal.5th 181, 198.) " ' "[[I]f] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and

13

failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Generally, prejudice must also be affirmatively demonstrated. (*Ledesma, supra*, 43 Cal.3d at p. 217.) Prejudice is shown when there is a reasonable probability that, but for counsel's ineffective representation, the result of the proceeding would have been different. (*Strickland, supra*, 466 U.S. at p. 694.) A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*In re Hardy* (2007) 41 Cal.4th 977, 1018.)

## 2.

At trial, Souter's counsel stipulated that "Souter was present in San Bruno providing care for Sprocket with [Lujan] until about April 24th, 2016, at which time he returned to his home in New Mexico."

The stipulation was first discussed, during argument on in limine motions, when Souter disputed the admissibility of a series of texts (between him and Lujan)—specifically texts dated April 12, April 14, and April 21.

On April 21 (after Sprocket had been burned), Souter texted Lujan, " 'Your fucking dog bit me again when I was trying to feed him.' " She replied, " 'Well babe Athena bit me and you both when we were doing that. Spank him.' " Souter texted back, " 'Yeah I did but he keeps drawing blood.' " The prosecutor argued these texts were relevant because they showed, among other things, that Souter was caring for Sprocket—as required under section 597, subdivision (b)—after he was burned.

Souter's counsel then offered to stipulate that Souter was caring for Sprocket up until the time he returned to New Mexico.

14

Specifically, Souter's counsel stated: "I don't think this text is necessary to establish that. *That's a fact that's not really in dispute*, as far as, you know, a point in time after Sprocket was injured. Both Mr. Souter and Miss Lujan both had periods of time that they were caring for the dog different periods of time, and I think that's something we can address via stipulation. That's pretty easy to determine." (Italics added.) Understanding that the parties would work out a stipulation, the trial court ruled that the three April 21 messages were inadmissible.

Despite this pretrial ruling, the court later admitted the April 21 text messages. Before the text messages in People's Exhibit Six were admitted, Souter's counsel expressed concern that the April 21 messages were included. However, the court (mistakenly) expressed its belief that, in ruling on pretrial motions, it had only excluded text messages from April 14. The prosecutor agreed with the trial court's understanding and Souter's counsel said, "All right. I'll accept it."

After Hanley concluded her testimony—including reading the entirety of People's Exhibit Six to the jury, Souter's counsel stipulated that "Souter was present in San Bruno providing care for Sprocket with [Lujan] until about April 24th, 2016, at which time he returned to his home in New Mexico."

**3.**

Souter insists that we cannot defer to his trial counsel's tactical decision to so stipulate because counsel failed to successfully exclude the April 21 text messages. We disagree.

Although he does not challenge admission of the April 21 texts themselves, Souter's argument is premised on the false assumption that the only tactical reason for defense counsel to enter the stipulation was to exclude the April 21 messages. But his trial counsel also candidly admitted that there was no dispute

that Souter was responsible for Sprocket's care between the time Sprocket was burned and when Souter returned to New Mexico.

That conclusion is supported by the text messages in People's Exhibit Six and by Lujan's testimony. Lujan testified that Souter was responsible for caring for Sprocket when she was in school, which included April 19, April 20, and April 21. And, in his messages, Souter admits that he was caring for and disciplining Sprocket, in the relevant time period, while Lujan was absent. Even after Souter returned to New Mexico, the messages indicate he was directing the home treatment of Sprocket's burns. Thus, the record supports the People's argument that trial counsel decided to stipulate to the care element because it would allow defense counsel to maintain credibility with the jury—by not pressing weak arguments. (See *People v. Farwell* (2018) 5 Cal.5th 295, 308 [the decision to stipulate is a tactical one which "can serve the salutary goals of expediting and simplifying proceedings, thus reducing the chance for confusion"].)

It is not our role to second guess the wisdom of such a tactic. (*People v. Kelly* (1992) 1 Cal.4th 495, 520.) Here, the tactic may well have been successful—as the jury failed to reach a verdict on count one (purposeful and malicious animal cruelty). And our high court has repeatedly rejected similar ineffective assistance claims based on a defense counsel's decision to concede elements of a crime or even guilt altogether. (*People v. Freeman* (1994) 8 Cal.4th 450, 498; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1060-1061 ["good trial tactics often demand complete candor with the jury, and . . . in light of the weight of the evidence incriminating a defendant, an attorney may be more realistic and effective by avoiding sweeping declarations of his or her client's innocence"].) Souter cannot meet his burden to show affirmative evidence that no rational tactical purpose supported defense counsel's stipulation decision.

16

In any event, Souter cannot demonstrate prejudice because the text messages (and Lujan's testimony) showed overwhelmingly that Souter was responsible for Sprocket's care between April 19 and April 24.

**4.**

In his opening brief, Souter also suggests (obliquely and without citation to authority) that defense counsel provided ineffective assistance by failing to argue that the word "charge" in section 597, subdivision (b), means something more than "care." In Souter's view, a caregiver must also take financial responsibility for an animal or have ultimate decision-making authority to have the animal in their charge. We need not address this forfeited argument. (See Cal. Rules of Court, rules 8.204(a)(1)(B) & 8.360(a); *People v. Stanley* (1995) 10 Cal.4th 764, 793 [reviewing courts may disregard points missing cogent legal argument]; *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4, [arguments raised for the first time in reply brief are forfeited].)

In any event, Souter's belatedly raised argument is without merit. The plain meaning of "having the charge" in this context is having supervision or caregiving responsibility. (Merriam-Webster's Online Dict. at https://www.merriam-webster.com/dictionary/charge [noun definitions 3a and 3b, as of April 6, 2023].) And, by using the phrase "whoever, having the charge or custody of any animal, *either as owner or otherwise*," the Legislature made clear that, contrary to Souter's assertion, it did not wish to limit criminal liability to those with financial responsibility for an animal. (§ 597, subd. (b), italics added; cf. *People v. Cochran* (1998) 62 Cal.App.4th 826, 832 [having " 'care or custody' [of a child (as required by section 273a) does] not imply a familial relationship but only a willingness to assume duties correspondent to the role of a caregiver"].)

17

## C.

Souter also argues that his trial counsel was ineffective in failing to raise a hearsay objection to portions of Hanley's testimony. We conclude that defense counsel had a reasonable tactical reason not to object and that Souter cannot show prejudice.

## 1.

During the prosecutor's direct examination and Lujan's cross examination, Hanley repeatedly testified (without objection from Souter's counsel) that (with one exception) all the veterinary clinics contacted by Hanley and another investigator said that they did not recall a call about a burned dog and that they would not advise the owner of a burned dog (over the phone) to treat the dog at home without seeing a veterinarian. With respect to the exception, Hanley testified that Heather P. "recalled a man, who she described in his early to mid 20s, calling in describing an accidental burn, and she told him that the dog needed to be brought in immediately."

The recordings of Hanley's second and third interviews of Lujan include similar statements (made by Hanley)—that all the contacted veterinary offices said that they would advise a pet owner to immediately bring in a burned dog and would not give medical advice over the phone.

## 2.

We assume (without deciding) that a hearsay objection would have properly been sustained. Nonetheless, we agree with the People that Souter cannot meet his burden to show there could be no rational tactical purpose for counsel's failure to object.

18

"Competent counsel may forgo even a valid objection for tactical reasons." (*People v. Campbell* (2020) 51 Cal.App.5th 463, 506; accord, *People v. Carrasco* (2014) 59 Cal.4th 924, 985.)

Here, the record suggests that Souter's counsel may have reasonably elected to withhold objections to Hanley's recitation of others' out of court statements because it was less damaging than live witness testimony to the same effect. (See *People v. Campbell, supra,* 51 Cal.App.5th at p. 506.) Remember that the substance of this evidence (regardless of its source) contradicts Souter's prior statement to Hanley—that *none* of the veterinary clinics he contacted told him Sprocket needed to be seen by a vet. Thus, Souter's defense counsel may have rationally concluded that the hearsay evidence was less damaging to Souter's credibility.

Souter offers no response to the People's argument on this point. Having failed to rebut the presumption that his trial counsel elected not to object for a rational tactical reason, Souter fails to establish ineffective assistance of counsel.

In any event, Souter also fails to carry his burden to demonstrate prejudice. Hanley's testimony regarding the results of her calls to other veterinary clinics was largely cumulative. Both Heather P. and another veterinary clinic's customer service representative testified that they are trained to refrain from giving medical advice over the phone. Heather P. testified that she specifically remembered the April 2016 phone call and that she told the male caller burns were easily infected and required immediate veterinary care. And one of Souter's own text messages stated that " 'all vet[s] do is tell you to bring them in.' "

On this record, it is not reasonably probable Souter would have achieved a more favorable result but for trial counsel's failure to object.

19

## D.

Next, both Souter and Lujan insist that the trial court erred by admitting an inadmissible legal conclusion from Dr. Barchas. We conclude any error was harmless.

## 1.

Prior to trial, Souter and Lujan moved to exclude testimony expressing opinions on their guilt, on whether a crime had been committed, or on the definitions of the charged crimes. Although the trial court agreed that opinions on guilt or innocence were inadmissible, the trial court denied the motion (without prejudice) as insufficiently specific. It admonished defendants' counsel to object if or when an objectionable question was posed.

During cross-examination of Sprocket's treating veterinarian, Lujan's counsel asked Dr. Barchas if Lujan's demeanor caused him to delay his report of suspected animal cruelty. Dr. Barchas answered, "The reason I reported the incident is because she told me that it had been a week since the injuries were sustained and that was compatible with what I was seeing on my patient, and *I considered that to be gross negligence and animal abuse* to let an animal suffer in extreme agony for a week without seeking veterinary care." (Italics added.) At this point, Souter's counsel objected (without identifying grounds for his objection) and moved to strike Dr. Barchas's testimony. The trial court overruled the objection.

## 2.

We assume (without deciding) that the motion in limine and Souter's unidentified objection were sufficient to preserve both defendants' current challenge to Dr. Barchas's testimony.

We also assume (for the sake of argument) that Souter and Lujan are correct that the trial court abused its discretion in allowing Dr. Barchas to invade the jury's province—by opining on

20

the ultimate question of whether Lujan's (and implicitly Souter's) failure to obtain earlier veterinary care was grossly negligent. Nonetheless, we conclude any error was harmless.

The evidence overwhelmingly supports a finding that both Souter and Lujan were grossly negligent in failing to obtain veterinary care for Sprocket and instead subjecting him to home treatment. With respect to Souter, the photograph he took of Sprocket's burned skin, on April 19, demonstrates that Sprocket was seriously injured. Souter also admitted (in the text messages he sent that day) knowing as much. And Souter admitted in his text messages that he knew, before leaving on April 24, Sprocket was in pain, had lost a lot of weight, and was lethargic. Lujan also admitted knowing as much then and through May 1.

In yet another text message, Souter admitted that " 'all vet[s] do is tell you to bring them in.' " This, of course, jibes with veterinary technician Heather P.'s testimony that she advised a caller—presumably Souter—that a vet should examine the dog, that burns are easily infected, and that the dog should not be treated at home. Considering Souter's texts, Heather P.'s testimony, and Lujan's statements about the advice he received on April 19, the evidence was overwhelming that Souter knew Sprocket needed to be examined by a veterinarian but later lied about it. Lujan's text messages and statements to Hanley show that Lujan also knew that Sprocket needed veterinary care before he received it *and* that her inaction made things worse.

The crux of the defense theory was that Souter and Lujan mistakenly but reasonably believed Sprocket was healing and that Sprocket was not in pain. Even if we acknowledge that there is some evidence to support defendants' claim that they subjectively believed (between April 19 and April 31) that Sprocket was healing on his own, without veterinary care, that does not make this a close case. The jury was correctly instructed that the required mental state for a violation of section 597,

21

subdivision (b), is gross negligence, which is judged by an objective standard of reasonableness. (*People v. Speegle* (1997) 53 Cal.App.4th 1405, 1411.) The defendant's conduct "must be such a gross departure from the reasonably prudent that it amounts to reckless indifference with actual or imputed knowledge of the consequences." (*Id.* at pp. 1414-1415, fn. 7.)

The defense theory is not credible considering the text messages and photographs showing defendants' awareness of Sprocket's serious injuries (as well as his lethargic and weak condition) both before and after April 24, along with the evidence showing their knowledge that veterinary care was needed for such serious injuries. Consideration of the record as a whole leads inescapably to the conclusion that it was grossly negligent to fail to take Sprocket to the vet—despite his obviously serious injuries and deteriorating condition—and to instead bathe him, pop his blisters, and cut off his skin to reveal " 'raw open wound[s].' "

On this record, defendants cannot demonstrate prejudice by pointing to the length of jury deliberations (three days) and request for a readback of testimony. (See *People v. Johnson* (2015) 61 Cal.4th 734, 752-753; *People v. Houston* (2005) 130 Cal.App.4th 279, 301 [four days of jury deliberations and requests for read back of witness testimony demonstrated only jury's diligence].) On the question of defendants' gross negligence, this was not a close case. It is not reasonably probable that, had Dr. Barchas's isolated comment been excluded, a juror would have found reasonable doubt existed as to defendants' gross negligence.

## E.

Next, Souter and Lujan argue, and the People concede, that we must strike their probation supervision fees (up to $100 per month) pursuant to the enactment of Assembly Bill No. 1869 ((2019-2020 Reg. Sess.), Stats. 2020, ch. 92). We agree.

After Lujan's and Souter's sentencing hearing, Assembly Bill No. 1869 repealed the statute, as of July 1, 2021, that authorized collection of the probation supervision fee and a fee for "processing a jurisdictional transfer pursuant to Section 1203.9" (former § 1203.1b, subd. (a), as amended by Stats. 2014, ch. 468, § 1). (Stats. 2020, ch. 92, § 47; *People v. Clark* (2021) 67 Cal.App.5th 248, 252.) The Legislature also enacted section 1465.9, which provides that the balance of any costs imposed by a court "pursuant to Section . . . 1203.1b . . . as [that] section[] read on June 30, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs *shall be vacated*." (§ 1465.9, subd. (a), italics added.) Accordingly, we are required to strike the monthly probation supervision fee. (*Ibid*.; *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953-954, & fn. 8; *Clark, supra*, at pp. 259-260.)

We agree with Souter that we must also strike a jurisdictional transfer fee ($600), which was imposed pursuant to former sections 1203.1b and 1203.9 and subsequently eliminated by the passage of both Assembly Bill No. 1869 and Assembly Bill No. 177. (§ 1465.9, subd. (b), as amended by Stats 2021, ch. 257, § 35 ["On and after January 1, 2022 the balance of any court-imposed costs pursuant to Section . . . 1203.9 . . . , as [it] read on December 31, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs *shall be vacated*"], italics added.)

Because the plain language of section 1465.9 compels it, we also direct the trial court to strike the probation transfer fee imposed under former sections 1203.1b and 1203.9. (§ 1465.9, subds. (a)-(b); cf. *People v. Greeley* (2021) 70 Cal.App.5th 609, 625-627; *People v. Clark, supra*, 67 Cal.App.5th at pp. 259-260.)

## F.

Lujan also argues that the written probation order must be modified to reflect only the probations conditions orally pronounced by the trial court. However, the parties now agree this issue is moot because Lujan's probation has terminated. We do not address the matter further because it is moot. *(People v. Carbajal* (1995) 10 Cal.4th 1114, 1120, fn. 5.)

## DISPOSITION

The orders of probation are modified to strike the probation supervision fee and the probation transfer fee. As so modified, the judgments are affirmed.

_____
BURNS, J.

We concur:

_____
JACKSON, P.J.

_____
LANGHORNE, J.*

A161941/A162047

---

\* Judge of the Napa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.